Troy L. FREEMAN, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.A. 03–2095–KHV.

United States District Court,
D. Kansas.

Jan. 7, 2004.

Joan H. Deans, Deans Law Office, Raytown, MO, for Plaintiff.

Melanie D. Caro, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Troy L. Freeman appeals the final decision of the Commissioner of Social Security to deny disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This matter is before the Court on plaintiff's *Motion For Judgment* (Doc. # 5) filed September 26, 2003. For reasons set forth below, the Court overrules plaintiff's motion.

### Procedural Background

On September 10, 1999, plaintiff filed his disability application with the Social Security Administration. He alleged a disability onset date of May 14, 1999. Plaintiff's benefit application was denied initially and on reconsideration. On April 23, 2001, the administrative law judge ("ALJ") concluded that plaintiff was not under a disability as defined in the Social Security Act and that he was not entitled to disability benefits. On December 30, 2002, the Appeals Council denied plaintiff's request for review. The decision of the ALJ stands as the final decision of the Commissioner. *See* 42 U.S.C. § 405(g), § 1383(c)(3).

### Factual Background

The following is a brief summary of the evidence presented to the ALJ.

Troy L. Freeman is 37 years old. He suffers from degenerative disc disease of the cervical, thoracic and lumbar spine, Scheuermann's disease (osteochondrosis of the vertebrae), hypertension and depression. Transcript Of Proceedings Before The Social Security Administration ("Tr.") at 24, attached to defendant's *Answer* (Doc. # 4) filed August 14, 2003. The ALJ concluded that plaintiff is unable to perform his past relevant work, but that he can perform other work despite his impairments. Tr. 25.

Plaintiff is a high school graduate. He currently lives alone and receives supplemental long-term disability from J.C. Penney's in the amount of $1,191.66 a month. Tr. 364–65. From approximately 1988 through May of 1999, plaintiff worked in a

warehouse at J.C. Penney's and regularly lifted 50 to 100 pounds. Tr. 363–64. From 1986 through 1988, plaintiff worked as a stocker for Dahl's grocery store, where he regularly lifted 25 to 50 pounds. Tr. 364.

In April 1998, plaintiff was diagnosed with severe valvular aortic stenosis and had a successful aortic valve replacement. Tr. 156. During a post-operative visit on April 14, 1998, plaintiff told his doctor that he was "slightly depressed." Tr. 191.

On July 1, 1998, James S. Appelbaum, M.D., a neurologist, examined plaintiff for complaints of memory loss over the previous three weeks, disorientation, moodiness, occasional blurred vision, and generalized weakness and fatigue with occasional mild headaches. Tr. 187. Dr. Appelbaum noted that plaintiff had some symptoms of depression and some memory problems, but that his neurological examination was normal. Tr. 188. He indicated that plaintiff's depression was likely the source of his memory loss and that his current medication (Metoprolol) could cause depression. Dr. Appelbaum recommended re-starting Paxil and reducing the dosage of Metoprolol. Dr. Appelbaum recommended that plaintiff hold off on neurological testing or counseling.

On September 4, 1998, Dr. Appelbaum re-examined plaintiff for memory problems. Dr. Appelbaum noted that plaintiff had some paraspinal muscle spasm, but fairly good range of motion and normal reflexes, strength, and sensation. Tr.184. Plaintiff reported that his memory problems were getting better and that he looked forward to going back to work, but that ongoing back pain prevented him from doing so. Dr. Appelbaum assessed lumbar strain and prescribed Darvocet. Tr. 184.

On October 2, 1998, Dr. Appelbaum re-examined plaintiff for memory problems and back pain. Dr. Appelbaum noted:

It is time to return the patient to work. I would like him to work light duty for the next two weeks and then call me with an update. I will move him on to full duty if he does well for the next two weeks.

Tr. 183.

On October 30, 1998, on re-examination, Dr. Appelbaum noted that plaintiff denied memory problems and he had returned to work with a weight restriction. Tr. 182.

On November 13, 1998, Ashwani Mehta, M.D. examined plaintiff for follow-up related to his heart surgery in April of 1998. Dr. Mehta noted plaintiff's report of symptoms that he had experienced before his heart surgery, including fatigue, dizziness, shortness of breath on exertion and difficulty sleeping. Tr. 225. Dr. Mehta concluded, however, that plaintiff's symptoms did not suggest cardiac or valvular problems. Tr. 227. Dr. Mehta made changes in plaintiff's medications. *Id.*

On January 11, 1999, after examinations on October 15, November 16 and December 7, 1998, Robert M. Beatty, M.D. noted that it was difficult to tell if plaintiff's back problems had improved and that plaintiff still had lower back pain. He noted that plaintiff had central disk protrusion at L5–S1 and also at L4–5, but that an operation might be difficult because of plaintiff's previous heart surgery and Coumadin medication. Tr. 194. Dr. Beatty noted that plaintiff was able to work every day and that he had good strength in his lower extremities. *Id.* Dr. Beatty concluded, however, that plaintiff should not lift more than 30 pounds at work. *Id.*

On February 26, 1999, Dr. Mehta examined plaintiff for heart palpitations and a high blood pressure reading. Plaintiff's

blood pressure and pulse were normal during the office visit, so Dr. Mehta placed a monitor on plaintiff to evaluate the palpitations. He scheduled plaintiff to return in six months.

On March 15, 1999, Steven Dr. Rettinger, M.D. examined plaintiff for a second opinion regarding back pain. Plaintiff reported that he was unable to do his job lifting heavy materials and that he had to do a desk-type job. Tr. 280. Dr. Rettinger concurred with Dr. Beatty that surgery was not an option because of plaintiff's previous heart surgery. Dr. Rettinger recommended a pain clinic for control of back pain. Dr. Rettinger also recommended a Milwaukee brace that had to be worn at least two years before he could determine whether it was helpful. Tr. 282.

On April 7, 1999, Ravi K. Bhagat, M.D. examined plaintiff for complaints of blurred vision, spots in both eyes, stress and fatigue because of inability to sleep well at night due to severe upper back pain. Dr. Bhagat assessed visual complaints and adjusted plaintiff's medications. Tr. 222.

On May 4, 1999, plaintiff told Dr. Rettinger that he had chronic back pain that made it difficult to perform his job. Dr. Rettinger indicated that plaintiff was permanently limited to light duty lifting up to ten pounds with no bending, twisting, knee bending, ladder climbing, pushing, pulling, or prolonged standing or sitting. Tr. 277. Dr. Rettinger stated that plaintiff could not do a production job and needed a non-production one. *Id.*

On May 17, 1999, plaintiff reported to Dr. Rettinger that he "felt relatively well of late." Tr. 274. Dr. Rettinger noted that plaintiff was off work, but that J.C. Penney's was looking for a job which would satisfy his medical restrictions. *Id.*

On June 10, 1999, Dr. Rettinger noted that plaintiff had received partial disability at work. Plaintiff reported that he had been sleeping quite well and had minimal aches and pains. Tr. 270.

On July 12, 1999, Dr. Rettinger noted that plaintiff had continued to do well and had been walking 30 to 60 minutes per day. Tr. 268.

On October 5, 1999, plaintiff returned to Dr. Rettinger because of a sudden onset of lower back pain. Tr. 267. A week later, Dr. Rettinger noted that plaintiff's back pain had improved and that plaintiff could expect his pain to resolve slowly over the next three weeks. Tr. 266.

On October 13, 1999, at the request of the Social Security Administration, David R. Mouille, Ph.D., a psychologist, examined plaintiff. Dr. Mouille noted that plaintiff denied all symptoms of mental disorder and denied that he had ever been treated for a mental disorder. Tr. 258. Plaintiff reported that he left his warehouse job in May 1999 because the position had been "dissolved." *Id.* Plaintiff also reported that he was able to maintain his own schedule, bathe, cook, drive, pay bills, do chores, care for a child or sick adult, shop, do lawn work and use public transportation. Tr. 260. Dr. Mouille noted that plaintiff's ability to think abstractly was reduced and that his ability to remember and recall information, form judgments, make decisions, understand the world about him and solve problems, and his attention, concentration and memory, were somewhat reduced but not impaired. Dr. Mouille did not think that plaintiff was depressed. Dr. Mouille concluded that plaintiff's ability to perform activities of daily living, maintain adequate relationships with co-workers, understand and perform simple tasks in an average amount of time, concentrate and maintain

an adequate work schedule were not impaired by any psychological limitation. *Id.*

In an activities of daily living form completed on February 10, 2000, plaintiff reported that he did laundry twice a week for approximately three hours without assistance, that he prepared full meals twice a week and cooked without assistance approximately four times per week, that he vacuumed and dusted one to two hours per week, that he went shopping for groceries and other items approximately three times per month without assistance, that he drove and could use public transportation without assistance and that he watched television or listened to the radio approximately three or four hours per day. Tr. 98–100.

On February 17, 2000, David B. Johnson, M.D. reported that plaintiff had chronic back pain, but that he saw no evidence of mental status or neurological problems. Tr. 314. Dr. Johnson did not offer an opinion on plaintiff's back condition. Dr. Johnson noted that from a cardiovascular standpoint, plaintiff could maintain normal activities but should avoid extremes of heavy lifting, exertion or temperature. *Id.*

On April 7, 2000, plaintiff had magnetic resonance imaging (MRI) scans of his back. A MRI of the cervical spine revealed mild narrowing of the left neural foramen at C4–5 and narrowing of the neural foramina bilaterally at the C6–7 level from disk bulging and associated osteophytes. Tr. 317. A MRI of the thoracic spine revealed relative spinal stenosis and mild posterior disk bulging at the T8–9 level with slight mass effect on the thecal sac. Tr. 318. A MRI of the lumbar spine revealed degenerative changes involving all lumbar intervertebral disks with small central posterior disk protrusion at L1–2 and L2–3 and mass effect on the right L2 nerve root at L1–2 from the disk protrusion. Tr. 319.

On September 28, 2000, David B. Johnson, M.D. indicated that plaintiff's condition satisfied the medical listing requirements for Listing 1.05C.[1] Tr. 315–16.

On October 27, 2000, plaintiff had a static scanning spinal examination through surface electromyography (SEMG) which revealed "high" muscle tension at the T1, T3, T5, T7, T9, T11, L1, L3 and L5 levels and "moderately high" muscle tension at the C2, C4, C6, T1, T5, T7 and L1 levels. Tr. 322–23.

Dr. Johnson examined plaintiff several times from January 19 through October 27, 2000. On October 27, 2000, Dr. Johnson completed a Physician's Source Statement. He indicated that plaintiff had been disabled since April of 1998 due to degenerative disc disease of the cervical, thoracic and lumbar spine. Tr. 324. He further indicated that plaintiff's condition was unresponsive to multiple treatment modalities and that side effects to his current medications included fatigue and drowsiness. Tr. 325. In addition, Dr. Johnson noted that plaintiff experienced moderate to severe pain and that these complaints were consistent with his objective findings. *Id.*

Dr. Johnson concluded that plaintiff had an affective disorder that satisfied the re-

---

1. The musculoskeletal system listings were changed effective February 19, 2002. Prior Listing 1.05C now corresponds to Listing 1.04. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 1.05C requirements included other vertebrogenic disorders (*e.g.,* herniated nucleus puplosus, spinal stenosis) persisting for at least three months despite prescribed therapy and expected to last 12 months, with both (1) pain, muscle spasm, and significant limitation of motion in the spine, and (2) appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. Tr. 315–16.

quirements of Listing 12.04. Tr. 326–27. In particular, he found that plaintiff's symptoms included anhedonia and pervasive loss of interest in almost all activities, sleep disturbances, psychomotor agitation or retardation and decreased energy. Tr. 326. He further indicated that these symptoms resulted in marked restriction of activities of daily living, marked deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation in work or work-like settings which cause plaintiff to withdraw from the situation or to experience exacerbation of signs and symptoms. Tr. 327.

As to plaintiff's physical limitations, Dr. Johnson indicated that plaintiff could not lift more than ten pounds, could not stand and/or walk more than two hours in an eight-hour workday, could not sit more than one hour in an eight-hour workday, and that alternating between sitting and standing, breaks and lunch periods would not provide plaintiff sufficient relief for his limitations. Tr. 328–29. Dr. Johnson's assessment covered the period from January through October of 2000. Tr. 330.

Dr. Appelbaum examined plaintiff on July 1, August 5, September 4, October 2 and 30, 1998. On September 25, 2000, Dr. Appelbaum examined plaintiff for the apparent purpose of preparing a Physician's Source Statement, which he completed on October 27, 2000. Dr. Appelbaum indicated that plaintiff had been disabled since September of 1998. Tr. 331. Dr. Appelbaum concluded that plaintiff had an affective disorder that satisfied the requirements of Listing 12.04. In particular, he found that plaintiff's symptoms included anhedonia and pervasive loss of interest in almost all activities, appetite disturbances with change in weight, sleep disturbances, decreased energy, feelings of guilt and

worthlessness, and difficulty concentrating or thinking. Tr. 333. Dr. Appelbaum indicated that these symptoms result in marked restriction of activities of daily living and marked difficulties in maintaining social functioning. Tr. 334.

As to plaintiff's physical limitations, Dr. Appelbaum noted that plaintiff had chronic neck, back and thoracic spine pain and that the side effects of his medication included fatigue and drowsiness. Tr. 331. He noted that plaintiff's pain was severe and his complaints of pain were consistent with the objective findings. Tr. 332. Dr. Appelbaum noted that plaintiff was physically limited to lifting less than ten pounds, standing and/or walking less than two hours in an eight-hour day and sitting less than one hour in an eight-hour day. Tr. 335–36.

At a hearing on December 14, 2000, plaintiff testified that he could not return to his former job because he could not lift heavy objects, bend over, pull or push things, or sit or stand for prolonged periods. Tr. 373. Plaintiff also testified that he could not perform a job which required lifting less than ten pounds with no prolonged sitting or standing because he has constant pain and fatigue. Tr. 379.

Plaintiff testified that he experiences back and neck pain daily and described a severe knife-like stabbing which at times brought him to tears. Tr. 365. Plaintiff testified that he has taken pain killers without relief and that he experiences side effects from his medications including stomach pain, fatigue, cramps and muscle spasms. Tr. 366. In addition to back and neck pain, plaintiff also experiences chest pain which he believes is related to heart problems. *Id.* Plaintiff testified that he suffers generalized fatigue and sleeps only two to three hours nightly. He takes afternoon naps, but even with naps he is

physically and mentally drained when he wakes. Tr. 369.

Plaintiff testified that he suffers from depression for which he takes Effexor. Tr. 367. He further testified that at least three times a week, he experiences difficulty with his memory and headaches, and once or twice a month, he has migraine headaches which take five to seven days to resolve. Tr. 367–69.

Plaintiff testified that with some difficulty, he can vacuum with a self-propelled vacuum. Tr. 374. Plaintiff testified that he seldom goes to the grocery store and must rely on his mother or girlfriend to buy groceries and carry them into the house. Tr. 375–76. In addition, he must rely on his mother and girlfriend to cook meals. Tr. 374. Plaintiff drives only once in a while because of back and neck pain. Tr. 376. Plaintiff can lift a basket of laundry if the clothes are dry, but he relies on his girlfriend to help with laundry. Tr. 374.

Plaintiff testified that he experiences difficulty bathing and getting in and out of the shower. Tr. 372. He also experiences difficulty putting on his socks and shoes and he does not leave home much due to pain.

Plaintiff testified that he attempted to mow his lawn several times with a riding mower, but it was too difficult because of the strain on his back and neck. Tr. 374–75. Plaintiff generally watches television and reads. Tr. 377–78. He can read for only approximately 15 minutes, however, because reading for longer periods causes headaches. Tr. 377.

The Commissioner retained Karen Sherwood to testify as a vocational expert. The ALJ asked Sherwood to consider a claimant of plaintiff's age, education and work experience. The ALJ hypothesized that claimant has the following limitations:

he cannot lift anything over ten pounds; he cannot perform much walking; and he must be able to alternate between sitting and standing within his own discretion at 15 minute intervals. Tr. 382–83. Sherwood testified that based on the ALJ's description of plaintiff's capacity, he could not perform his past relevant work but he could perform work as a surveillance system monitor, information clerk or cashier, all of which are sedentary positions. Tr. 383. Sherwood indicated, however, that if the claimant had a moderate degree of difficulty with concentration, persistence or pace, no work would be available in the national economy. Tr. 384.

In his order of April 23, 2001, the ALJ made the following findings:

1. Claimant met the special earnings requirements of Title II of the Act on May 14, 1999, the date he stated that he became unable to work. He continues to meet them through the date of this decision.

2. Claimant has not engaged in substantial gainful activity since May 14, 1999.

3. Claimant has the following "severe" combination of impairments that has more than a minimal impact on his ability to perform basic work activities: degenerative disc disease of the cervical, thoracic, and lumbar spine, with bulging discs at L1–2, L2–3, L4–5, and L5–S1, but no evidence of a herniated nucleus pulposus; Scheuermann's disease (osteochondrosus of the vertebrae); a history of aortic valve replacement, April 1998, now asymptomatic from a cardiac standpoint; hypertension; and mild depression (not separately severe).

4. Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The testimony and allegations of the claimant are not credible for the reasons described in the evidence and evaluation section of this decision.

6. Claimant's residual functional capacity is as propounded in the first hypothetical question to the vocational expert at the hearing. This described an ability to perform work requiring lifting no more than 10 pounds; no prolonged walking; and no climbing, bending, stooping, squatting, crouching, or kneeling. Claimant also requires a sit/stand option at 15–minute intervals. Mentally, claimant has no restrictions of activities of daily living. He has only mild difficulties in maintaining social functioning, and he can interact socially with others throughout the workday. He has only mild difficulties in maintaining concentration, persistence, or pace, allowing him regularly to complete simple tasks and understand, remember, and carry out simple instructions in a timely manner. He has no repeated episodes of decompensation, each of extended duration.

7. Claimant is unable to perform his past relevant work.

8. Claimant is a "younger" individual with a "high school" education.

9. Claimant has no acquired transferable work skills.

10. Considering claimant's residual functional capacity, no rule tabled in 20 C.F.R. Part 404, Subpart P, Appendix 2 directs a disposition of "disabled" for a person of claimant's age, education and vocational experience. The grid rules, however, are not applicable due to the non-exertional limitations on his residual functional capacity.

11. Considering claimant's vocational profile and above-described residual functional capacity, there are sedentary, unskilled jobs existing in significant numbers in the local and national economies that claimant is able to perform despite his impairments. Examples are surveillance system monitor, information clerk, and cashier. This finding is based on the vocational expert's testimony.

12. Claimant has not been under a "disability" at any time from his alleged disability onset date, May 14, 1999, through the date of this decision.

Tr. 24–25.

Shortly after the ALJ decision, on May 14, 2001, Chester L. Day, M.D., a psychiatrist, examined plaintiff for an initial consultation. Dr. Day assessed decreased attention span, low self-esteem, feelings of worthlessness and decreased recent and immediate memory. Dr. Day diagnosed plaintiff with recurrent major depression. He continued plaintiff's Effexor medication and added Remeron. Tr. 339.

Plaintiff also sought treatment from Jim Roberts, ACSW, a social worker and counselor. Roberts saw plaintiff for weekly visits from May 17 through June 14, 2001. Tr. 343. On June 14, 2001, Roberts prepared an assessment of plaintiff's mental ability to do work-related activities. Roberts indicated that plaintiff had a "fair" ability to follow work rules, get along with co-workers without distracting them or exhibiting behavioral extremes, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, deal with work stresses, function independently, and maintain attention for extended periods (two hours at a time) throughout an eight-hour workday. Tr. 344. On this form, a "fair" rating indicates that the ability to function in an area is seriously limited but not precluded. Tr. 343. Roberts indicated that plaintiff demonstrated a "poor" ability to understand, remember and carry

out complex job instructions, to understand, remember and carry out detailed, but not complex job instructions, and to relate predictably in social situations. Tr. 345–46. A "poor" rating indicates no useful ability to function in an area.

Roberts also opined that plaintiff satisfied the requirements of Listing 12.04. In particular, he found that plaintiff's symptoms included anhedonia and pervasive loss of interest in almost all activities, sleep disturbances, decreased energy, feelings of guilt and worthlessness, difficulty concentrating or thinking and thoughts of suicide or death. Tr. 347. Roberts indicated that these symptoms result in marked restriction of plaintiff's activities of daily living and ability to maintain social functioning; marked deficiencies of concentration, persistence or pace; and repeated episodes of decompensation for extended duration. Tr. 348.

Plaintiff submitted evidence to the Appeals Council of his office visits with Roberts and Dr. Day and the opinion of Roberts. The Appeals Council nevertheless denied plaintiff's request for review.

### Standard Of Review

■ The ALJ decision is binding on the Court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *See Castellano v. Sec'y of HHS*, 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (citation omitted).

### Analysis

■ Plaintiff bears the burden of proving disability under the Social Security Act. *See Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity for at least 12 months due to a medically determinable impairment. *See* 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. *See* 20 C.F.R. §§ 404.1520, 416.920. If a claimant satisfies steps one, two and three, he will automatically be found disabled; if a claimant satisfies steps one and two, but not three, he must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. *See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988).

Here, the ALJ denied benefits at step five, finding that plaintiff is capable of performing work in the national economy. In reaching his conclusion, the ALJ agreed that plaintiff had several severe impairments but rejected the opinions of Drs.

Johnson and Appelbaum that he could not work full time because of his condition.

## I. Plaintiff's Credibility

 Plaintiff argues that the ALJ improperly discounted his testimony. The Tenth Circuit has set forth the proper framework for analyzing evidence of disabling pain. The relevant factors are (1) whether claimant proves with objective medical evidence an impairment that causes pain; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) whether the pain is disabling based upon all objective and subjective evidence. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987). In the final step, the ALJ should consider the following factors:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir.1988).

Here, the ALJ found that plaintiff's "allegations and testimony are not credible." Tr. 23. In particular, the ALJ noted:

> His claims of disabling physical and mental limitations are not supported by the objective medical and clinical find-

ings of record. See especially Exhibits 2F–3F, 6F, 8F–9F, and 12F, described above, which consistently show non-disabling physical symptoms, allowing for at least sedentary exertional activity, and no significant psychological limitations. Moreover, claimant's activities of daily living are inconsistent with disability. He does laundry, mows the lawn with a riding lawn mower, and drives. He also watches two-hour movies and reads for 15 minutes at a time, demonstrating that his concentration is not significantly impaired. Additionally, claimant testified at the hearing that he believed he could attempt a hypothetical sedentary sit/stand job, which indicates that he does not believe that his condition is entirely work preclusive.

Tr. 23.

## A. Consistency Of Plaintiff's Complaints With Objective Medical Evidence

The ALJ first rejected plaintiff's complaints because they were not supported by the objective medical and clinical findings of record. *See* Tr. 23. The ALJ referred to several medical reports which showed no significant psychological limitations and non-disabling physical symptoms allowing for sedentary exertional activity. *See id.* The ALJ's conclusion is supported by substantial evidence.[2] *See Luna,* 834 F.2d at 165–66 (lack of objective medical evidence to support degree of pain alleged is important factor to consider in evaluating claim of disabling pain); *Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir.1990) (medical records must be consistent with

---

**2.** Most notably, on May 17, 1999, three days after the alleged disability onset date, Dr. Rettinger noted that plaintiff was feeling relatively well and was off work until J.C. Penney's could find him a job which satisfied his

medical restrictions, *i.e.* a sedentary type job. *See* Tr. 274. On June 10 and July 12, 1999, Dr. Rettinger noted that plaintiff was doing well with minimal aches and pains. Tr. 268, 270.

nonmedical testimony as to severity of pain).

Plaintiff argues that the ALJ should have concluded that his pain was disabling because (1) he underwent heart surgery in April of 1998 to relieve chest discomfort, (2) Dr. Beatty noted in January of 1999 that plaintiff's lower back pain was understandable because he had central disk protrusion at L5–S1 and also at L4–5, and (3) Dr. Beatty noted that an operation on plaintiff's back might be difficult because of plaintiff's previous heart surgery and his heart medication. *See* plaintiff's *Memorandum In Support Of Motion For Judgment* (Doc. # 6) at 20. As to the fact that plaintiff underwent heart surgery in April of 1998, the record does not reflect any disabling effects from that surgery. Indeed, on February 17, 2000, Dr. Johnson noted that from a cardiovascular standpoint, plaintiff could maintain normal activities but should avoid extremes of heavy lifting, exertion or temperature. *See* Tr. 314. As to Dr. Beatty's notations in January of 1999, he also noted during the same office visit that plaintiff was able to work every day, that he had good strength in his lower extremities and that plaintiff should not lift more than 30 pounds at work. *See* Tr. 194.

**B. Plaintiff's Daily Activities**

The ALJ also rejected plaintiff's complaints of disabling pain because they were inconsistent with his activities of daily living. *See* Tr. 23. The ALJ noted that plaintiff does laundry, mows the lawn with a riding mower, drives, watches two-hour movies and reads for 15 minutes at a time. *See id.* In addition, as Dr. Mouille noted in October of 1999, plaintiff reported that he was "able to maintain his own schedule, able to bathe himself, able to cook, able to drive, able to pay bills, able to do chores, able to care for a child or sick adult, able

to shop, able to do lawn work and able to use public transportation." Tr. 260. Likewise, in an activities of daily living form completed on February 10, 2000, plaintiff reported that he did laundry twice a week for approximately three hours without assistance, that he prepared full meals twice a week, that he cooked without assistance approximately four times a week, that he vacuumed and dusted approximately one to two hours a week, that he went shopping for groceries or other items approximately three times a month without assistance, that he drove and could use public transportation without assistance and that he watched television or listened to the radio approximately three or four hours a day. Tr. 98–100. At the hearing, plaintiff attempted to qualify his ability to do many household chores without assistance, but substantial evidence supports the ALJ conclusion as to plaintiff's daily activities.

**C. Plaintiff's Own Assessment Of His Abilities**

The ALJ noted that plaintiff "testified at the hearing that he believed he could attempt a hypothetical sedentary sit/stand job, which indicates that he does not believe that his condition is entirely work preclusive." *See* Tr. 23. After the ALJ described a position which consisted of not lifting more than ten pounds with a sit/stand option at plaintiff's discretion, plaintiff testified that "[i]f someone could find me a perfect job like that I would try my very best to do it." Tr. 378–79. Plaintiff testified, however, that he would not be able to maintain such a job because of fatigue and back pain. *See id.* Despite plaintiff's qualification of his statement, substantial evidence supports the ALJ conclusion that plaintiff does not believe his condition is entirely work preclusive. On May 17, 1999, three days after the alleged disability onset date, plaintiff reported to Dr. Rettinger that he "felt rela-

tively well of late" and that J.C. Penney's was looking for a position which would satisfy his medical restrictions.[3] Tr. 274. Dr. Rettinger noted that on examination, plaintiff had "mild" tenderness of the thoracic and cervical paraspinous muscles with "minimal" lumbar pain. *Id.* Dr. Rettinger restricted plaintiff to a non-production job that involved no bending, twisting or lifting more than ten pounds. *See id.* Nothing in the record suggests that plaintiff disagreed with his medical restriction in May of 1999—which clearly contemplated that he could perform a job with a sit/stand option and lifting no more than ten pounds.

### D. Plaintiff's Receipt Of Other Benefits

Plaintiff argues that in evaluating his credibility, the ALJ also should have considered his receipt of other disability benefits. Plaintiff testified that he receives $1,191.66 per month from a supplemental long term disability through J.C. Penney's. *See* Tr. 364–65. In fact, the ALJ considered plaintiff's receipt of other disability

benefits but found that such benefits may be a disincentive for plaintiff to try to find work.[4] *See* Tr. 22. Plaintiff has not shown that the standard for his receipt of disability benefits from J.C. Penney's is similar to the one the Social Security Administration must employ. *Cf. Musgrave v. Sullivan,* 966 F.2d 1371, 1375 (10th Cir. 1992) (disability determinations by other agencies not binding). Indeed, Dr. Rettinger, who helped plaintiff obtain his disability from J.C. Penney's, noted after plaintiff received his disability that he was capable of performing sedentary work. *See* Tr. 270, 274, 277.

### E. Overall Evaluation Of Credibility Factors

In reviewing ALJ credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS,* 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." *Hamilton v. Sec'y of HHS,* 961 F.2d 1495,

3. The fact that plaintiff was seeking a sedentary position with his employer suggests that he was not disabled. *See Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir.1995) (applying for jobs during claimed disability period shows that plaintiff did not view pain as disabling); *Barrett v. Shalala,* 38 F.3d 1019, 1024 (8th Cir.1994) (seeking work inconsistent with disability).

4. The Tenth Circuit has noted that a claimant's receipt of workers' compensation benefits has no bearing on the credibility of a claimant in a claim for social security benefits. *See Hinton v. Massanari,* 13 Fed. Appx. 819, 821 n. 1 (10th Cir.2001); *cf. Eichel v. N.Y. Cent. R.R.,* 375 U.S. 253, 255, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) ("it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act ... were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act"). The Tenth Circuit has not addressed

whether the receipt of disability benefits from a private employer is relevant to the ALJ's determination of a claimant's motivation to work. *Cf. Nguyen v. Shalala,* 1994 WL 362263, at *4 (N.D.Cal.1994) (receipt of AFDC benefits and income represented "obvious disincentive to work" and motive for exaggerating claims). In this case, however, the ALJ's comment merely reflected his opinion that plaintiff had a lengthy history of jobs which required significant physical exertion and that he had never tried to perform sedentary sit/stand jobs like those identified by the vocational expert. *See* Tr. 22. The ALJ did not include plaintiff's receipt of other benefits in his statement of reasons why he did not find plaintiff fully credible. *See* Tr. 23. Even if the Court assumes that the ALJ improperly relied on plaintiff's receipt of supplemental long term disability payments in his credibility determination, the ALJ's credibility analysis is supported by other substantial record evidence.

1499 (10th Cir.1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (quoting *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir.1988) (footnote omitted)). So long as he sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ is not required to conduct a formalistic factor-by-factor recitation of the evidence. *White v. Barnhart,* 287 F.3d 903, 909 (10th Cir.2001); *see Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir.2000). "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements." *See* Social Security Ruling 96–7p, 61 Fed.Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *See id.*

Here, the ALJ found some, but not all, of plaintiff's allegations were credible. Plaintiff primarily objects because the ALJ did not accept the conclusions of Drs. Johnson and Appelbaum that he was disabled and could sit a maximum of one hour per day. The ALJ accepted the restriction that plaintiff could lift no more than ten pounds, but the ALJ determined that if plaintiff could alternate sitting and standing every 15 minutes at his discretion, he could work a full eight-hour day. For reasons stated above, substantial evidence supports the ALJ decision to reject plaintiff's testimony that he could not work even with a sit/stand option. Although the ALJ could have discussed the evidence in greater detail, the record need only demonstrate that he considered all of the evidence; "an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir.1996) (citing *Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir.1984)).

## II. Opinion Of Treating Sources

 Plaintiff argues that the ALJ should have given controlling weight to the opinions of his treating physicians—Drs. Johnson and Appelbaum. The ALJ must give substantial weight to the opinion of a treating physician "unless good cause is shown to disregard it." *Goatcher v. United States Dep't of HHS,* 52 F.3d 288, 289–90 (10th Cir.1995). When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine reports of other physicians to see if they outweigh the reports of the treating physician. *See id.* The ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Id.* at 290 (citing 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. *See Goatcher,* 52 F.3d at 290.

Dr. Johnson indicated that plaintiff had been disabled since April of 1998 due to degenerative disc disease of the cervical, thoracic and lumbar spine and that his back condition satisfied the requirements

of Listing 1.05C. Tr. 324. Dr. Johnson also concluded that plaintiff had an affective disorder which satisfied the requirements of Listing 12.04. Tr. 326–27. Likewise, Dr. Appelbaum indicated that plaintiff had been disabled since September of 1998 and that he had an affective disorder which satisfied the requirements of Listing 12.04. Tr. 331–34.

The ALJ gave the following reasons for discounting Dr. Johnson's opinion:

> The undersigned rejects Dr. Johnson's opinions, because they consist solely of completing a checklist form, and are wholly unsupported by any objective/clinical findings. *See Hogan v. Appel*, 239 F.3d 958. Moreover, these opinions of Dr. Johnson are directly contradicted by the objective medical findings discussed above, including most notably his own objective findings on clinical examination in February 2000, wherein he noted that claimant had no evidence of mental or neurological problems; that from a cardiovascular standpoint, claimant appeared to be well compensated and stable with his aortic valve replacement and should be able to maintain normal activities; and that claimant should avoid only *extremes* of heavy lifting, exertion, and temperatures. (Exhibit 12F).

Tr. 20. As to Dr. Appelbaum's opinions, the ALJ stated that he rejected his opinions "for the same reasons that Dr. Johnson's opinions are accorded no weight." Tr. 20.

The ALJ discounted the opinions of Drs. Johnson and Appelbaum under the third and fourth factors of *Goatcher* and because the opinions were expressed on a checklist form. Plaintiff argues that the ALJ erred by discounting these opinions because the opinions are supported by the objective medical evidence. In support, plaintiff cites only the facts that (1) Drs. Johnson and Appelbaum both concluded plaintiff was disabled, (2) their physical and residual functional capacity ratings were virtually identical, and (3) their ratings were consistent with the findings of plaintiff's therapist in June of 2001 that plaintiff's mental impairment satisfied the requirements of Listing 12.04. *See* plaintiff's *Memorandum In Support Of Motion For Judgment* (Doc. # 6) filed September 26, 2003 at 22. Notably, plaintiff fails to cite any objective medical evidence which supports the opinions of Drs. Johnson and Appelbaum. The fact that the two medical opinions were virtually identical suggests that in September and October of 2000, plaintiff reported virtually identical symptoms to the two doctors who completed opinions on the same day—October 27, 2000.

The ALJ decision to reject the opinions of Drs. Johnson and Appelbaum is supported by substantial evidence. As to their opinions that plaintiff's back condition rendered him disabled, Dr. Johnson's report indicates that plaintiff's disability started in April of 1998 and Dr. Appelbaum's report indicates that his disability began in September of 1998. The medical evidence, however, is replete with references to plaintiff's ability to perform sedentary work until at least July of 1999. On October 2, 1998, Dr. Appelbaum noted that "[i]t is time to return the patient to work," starting with light duty. Tr. 183. On October 30, 1998, the last time Dr. Appelbaum examined plaintiff until the fall of 2000, Dr. Appelbaum noted that plaintiff had returned to work with a weight restriction. *See* Tr. 182. On January 11, 1999, Dr. Beatty noted that plaintiff was able to work every day but that he should not lift more than 30 pounds. *See* Tr. 194. On March 15, 1999, Dr. Rettinger noted that plaintiff had to do a desk-type job. *See* Tr. 280. On May 17, 1999, Dr. Ret-

tinger noted that plaintiff was feeling relatively well and was off work until J.C. Penney's could find him a job which satisfied his medical restrictions, *i.e.* a sedentary type job. *See* Tr. 274. On June 10 and July 12, 1999, Dr. Rettinger noted that plaintiff had been doing well with minimal aches and pains. Tr. 268, 270. Substantial evidence supports the ALJ decision to reject the opinions of Drs. Johnson and Appelbaum regarding plaintiff's back condition.

█ As to the opinions of Dr. Johnson and Dr. Appelbaum that plaintiff had an affective disorder which satisfied the requirements of Listing 12.04, the clinical record does not support such a conclusion. On July 1, 1998, nearly one year before the alleged onset of disability, Dr. Appelbaum noted that plaintiff had some symptoms of depression which were likely caused by his medication.[5] Tr. 188. Accordingly, Dr. Appelbaum changed plaintiff's medication. *Id.* Plaintiff apparently recovered from that episode of depression because the record does not reflect that he sought treatment for depression or any mental condition until May 14, 2001—less than one month after the ALJ issued an adverse decision on plaintiff's disability application. Indeed, at least until the hearing on December 14, 2000, plaintiff denied symptoms of a mental disorder. *See* Tr. 258 (October 13, 1999 consultation with psychologist); *cf.* Tr. 314 (on February 17, 2000, Dr. Johnson saw no evidence of mental status problems). Finally, Dr. Mouille, a consulting psychologist, concluded that plaintiff's condition did not satisfy Listing 12.04. Substantial evidence supports the ALJ's conclusion to discount the opinions of Drs. Johnson and Appelbaum as to plaintiff's affective disorder.

█ Shortly after the ALJ decision, plaintiff sought treatment from Dr. Day, a psychiatrist, who diagnosed plaintiff with recurrent major depression. Tr. 339. Plaintiff also sought treatment from Jim Roberts, a social worker and counselor, who saw plaintiff for weekly visits for one month, from May 17 through June 14, 2001. Tr. 343. On June 14, 2001, Roberts prepared an assessment of plaintiff's mental ability to do work-related activities and plaintiff submitted that assessment to the Appeals Council. The Tenth Circuit has held that "new evidence becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence." *O'Dell v. Shalala,* 44 F.3d 855, 859 (10th Cir.1994). The Social Security Administration Regulations allow submission of new and material evidence but limit consideration of that evidence by the Appeals Council unless it "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); *Westbrook v. Massanari,* 26 Fed. Appx. 897, 900 n. 2 (10th Cir. Feb.8, 2002). In this case, however, as in *O'Dell,* "consideration of the new evidence does not require a change in the outcome: the ALJ's determination remains supported by substantial evidence." *O'Dell,* 44 F.3d at 859. From the record, Roberts appears to be a counselor and social worker who does not qualify as an "acceptable medical source." *See* 20 C.F.R. § 404.1513(a) (acceptable sources include licensed or certified psychologists). In addition, Roberts saw plaintiff for only four weeks, some three years after his alleged disability onset date. Likewise, Dr. Day, though an acceptable medical source, saw plaintiff on only two occasions in May of 2001. Except for two limited references to depression in

---

**5.** During a post-operative visit regarding his heart on April 14, 1998, plaintiff also told his doctor that he was "slightly depressed." Tr. 191.

1998, no contemporaneous records support a diagnosis of depression before May of 2001. In these circumstances, the new evidence presented to the Appeals Council does not change the outcome of this case.[6]

## III. Step Three Analysis

Plaintiff does not directly challenge the ALJ ruling at step three, but he maintains that the ALJ should have given controlling weight to the opinions of his treating physicians who determined that plaintiff satisfied Listings 1.05C and 12.04 of the Listing of Impairments. At step three, the ALJ must determine whether the claimant has an impairment "equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Williams,* 844 F.2d at 751 (quotation omitted). The ALJ must make this determination solely on medical evidence. *See* 20 C.F.R. § 404.1526(b). To do so, the ALJ "compare[s] the symptoms, signs, and laboratory findings about [a claimant's] impairment(s), as shown in the medical evidence [associated with the claim], with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526(a). At step three, the claimant has the burden of demonstrating, through medical evidence, that his impairments "meet all of the specified medical criteria" contained in a particular listing. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

### A. Listing 1.05C

Under Listing 1.05C, an individual is considered disabled if he or she meets the following criteria:

C. Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

 1. Pain, muscle spasm and significant limitation of motion in the spine; and

 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.05C. The ALJ found that "all objective physical examinations and clinical findings show that claimant does not have the required *significant* limitation of motion in the spine with appropriate radicular distribution with *significant* motor loss, muscle weakness, *and* sensory and reflex loss." *See* Tr. 20.

Medical evidence at the time of the hearing did not establish that plaintiff satisfied the requirements of Listing 1.05C. For reasons explained above with respect to the opinions of Drs. Johnson and Appelbaum, the ALJ conclusion that plaintiff did not satisfy the criteria of Listing 1.05C is supported by substantial evidence.

### B. Listing 12.04

Under Listing 12.04 (affective disorder), an individual is considered disabled if he or she meets the following criteria:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a

---

**6.** If plaintiff continued treatment for depression, he may be able to seek disability on that basis for the period of time after the ALJ decision. *Cf.* 20 C.F.R. § 404.970(b) (new evidence before Appeals Council considered only as it "relates to the period on or before the date of the administrative law judge hearing decision"). On the present record, however, the Court must conclude that the decision of the Social Security Administration is based on substantial evidence.

prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

 a. Anhedonia or pervasive loss of interest in almost all activities; or

 b. Appetite disturbance with change in weight; or

 c. Sleep disturbance; or

 d. Psychomotor agitation or retardation; or

 e. Decreased energy; or

 f. Feelings of guilt or worthlessness; or

 g. Difficulty concentrating or thinking; or

 h. Thoughts of suicide; or

 i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

 a. Hyperactivity; or

 b. Pressure of speech; or

 c. Flight of ideas; or

 d. Inflated self-esteem; or

 e. Decreased need for sleep; or

 f. Easy distractibility; or

 g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

 h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04.

Between July 1, 1998 and May of 2001, plaintiff did not seek treatment for depression, and plaintiff did not claim any symptoms of mental disorder until a hearing in

December of 2000. Based on plaintiff's limited treatment in May and June of 2001, plaintiff did not establish that he met the requirements of Listing 12.04. In addition, for reasons explained above with respect to the opinions of Drs. Johnson and Appelbaum, the ALJ conclusion that plaintiff did not satisfy the criteria of Listing 12.04 is supported by substantial evidence.

## IV. Step Five Analysis

Plaintiff argues that the ALJ failed to sustain his burden at step five. At step five, the ALJ must determine whether—in view of plaintiff's age, education and work experience—plaintiff has the residual capacity to perform other work in the national economy. *See Bowen v. Yuckert,* 482 U.S. 137, 148, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The ALJ bears the burden of proof at step five. *See id.* at 146 n. 5, 107 S.Ct. 2287. To meet this burden, the ALJ must find that plaintiff can perform work "in the claimant's residual functional capacity category." *Talbot v. Heckler,* 814 F.2d 1456, 1462 (10th Cir. 1987).

The ALJ determined that plaintiff can lift up to ten pounds, cannot perform prolonged walking, sitting or standing, must be able to alternate sitting and standing at 15 minute intervals at his discretion, cannot perform any work involving climbing, bending, stooping, squatting, crouching, crawling or kneeling, and has a mild degree of difficulty with social functioning, concentration, persistence and pace that would not preclude completion of simple work tasks. Tr. 382–83.

Plaintiff argues that in determining his residual functional capacity, the ALJ improperly relied on his testimony about his ability to work and ignored the opinions of his treating physicians. The Court has addressed both objections above. In addition, the Court notes that the ALJ relied on plaintiff's testimony about his ability to work as only one factor in assessing his credibility. To determine plaintiff's residual functional capacity, the ALJ relied on the medical findings as well as other record evidence. Finally, the Court notes that Dr. Appelbaum did not find that plaintiff's depression resulted in deficiencies of concentration, persistence or pace in work settings or elsewhere. *See* Tr. 334. In sum, the Court finds that the ALJ's finding under step five is supported by substantial evidence.

**IT IS THEREFORE ORDERED** that plaintiff's *Motion For Judgment* (Doc. # 5) filed September 26, 2003 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that the Judgment of the Commissioner is **AFFIRMED**.